# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| United States of America, | Case No. 2:20-mj-00221-DJA-1 |
| Plaintiff, | |
| v. | **ORDER** |
| Louis Damato, | |
| Defendant. | |

Presently before this Court is the government's request under 18 U.S.C. § 3148(b) to revoke defendant Louis Damato's pretrial release. *See* ECF No. 9. Revoking a defendant's pretrial release under the Bail Reform Act involves a two-step process. The government can meet the first step by establishing by clear and convincing evidence that the defendant has violated a condition of his release. At the second step, the government must establish either that there exists no condition or combination of conditions of release that will assure that defendant will not flee or pose a danger to the community *or* that the defendant is unlikely to abide by any condition or combination of conditions of release. 18 U.S.C. § 3148(b)(2). Here, this Court finds that the government met its burden at the first step because it proved by clear and convincing evidence that Mr. Damato violated a condition of his release. However, the Court will deny the government's request because it failed to establish either prong of the second step by a preponderance of the evidence.

**I.     Background**

The government charged Mr. Damato with Threats Against a United States Official and Interstate Threats. *See* ECF No. 1. Both counts stem from conduct taking place on March 16, 2020, when Mr. Damato allegedly left a message for U.S. Representative Dina Titus stating that

he purchased a firearm and would go to Washington D.C. to kill her. *Id.* Mr. Damato appeared in court for an initial appearance and detention hearing on March 27, 2020. ECF No. 4.

At Mr. Damato's initial appearance, the government and the defense agreed that conditions could be fashioned under the Bail Reform Act and jointly requested that Mr. Damato be released. *See id.* This Court released Mr. Damato and imposed as one of the conditions that he reside at a half-way house on a lock-down basis absent specific exceptions. *See id.*

On March 29, 2020, Mr. Damato left the half-way house to go to the hospital and did not return. This formed the basis of the government's petition seeking to revoke his pretrial release. Mr. Damato was arrested on March 30, 2020, made an initial appearance on April 1, 2020, and was detained pending his revocation hearing. *See* ECF No. 12. During the revocation hearing on April 23, 2020 and April 24, 2020, this Court was presented with information relevant to the facts, findings, and observations below. *See* ECF Nos. 21-23, 27.

## II.    Discussion

The Bail Reform Act mandates the pretrial release of individuals charged with a criminal offense so long as the Court can be reasonably assured that the defendant does not pose a flight risk or danger to the community. 18 U.S.C. § 3142. Pretrial release should be denied "[o]nly in rare circumstances" and "doubts regarding the propriety of release should be resolved in the defendant's favor." *U.S. v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991). Thus, to the extent that conditions, or a combination of conditions, can be fashioned to reasonably provide these assurances, the individual must be released pending trial because detention is "the carefully limited exception." *United States v. Salerno,* 481 U.S. 739, 755 (1987).

The Bail Reform Act also dictates when pretrial release may be revoked. 18 U.S.C. § 3148(b).[1] Revocation is governed by a two-step process. At the first step, the Court must determine whether there is "probable cause to believe that the person has committed a Federal,

---

[1] Revocation of pretrial release is governed by § 3148, which provides "an entirely different set of standards" than the standards that the Court applies under § 3142 to resolve a motion for detention at the outset of a case. *U.S. v. Soria*, No. 2:11-cr-00156-LDG-RJJ, 2011 WL 3651272, at *5 (D. Nev. Aug. 17, 2011) (citing Weinberg, FEDERAL BAIL AND DETENTION HANDBOOK (2011) § 11.03).

1    State or local crime while on release," *or* whether there is "clear and convincing evidence that the
2    person has violated any other condition of release." *Id.* § 3148(b)(1). The burden of proof at this
3    step is on the government. *U.S. v. Petersen*, No. CRM 2008-0022, 2009 WL 1514402, at *1
4    (D.V.I. May 29, 2009).

5    At the second step, the Court "shall" enter an order revoking pretrial release if it finds
6    *either* that "based on the factors set forth in section 3142(g) . . . there is no condition or
7    combination of conditions of release that will assure that the person will not flee or pose a danger
8    to the safety of any other person or the community" *or* that "the person is unlikely to abide by any
9    condition or combination of conditions of release." 18 U.S.C. § 3148(b)(2). If the government
10   establishes probable cause to believe the individual "committed a Federal, State, or local felony"
11   while on pretrial release, then "a rebuttable presumption arises that no condition or combination
12   of conditions will assure that the person will not pose a danger to the safety of any other person or
13   the community." *Id.* § 3148(b).

14   However, if the rebuttable presumption does not apply, the statute is silent regarding the
15   evidentiary standard that must be met by the government at the second step. The Ninth Circuit has
16   not addressed this issue. However, the Second Circuit has. *See United States v. Gotti*, 794 F.2d
17   773 (2d Cir. 1986) ("findings made under section 3148(b)(2) may be established by a
18   preponderance of the evidence."); *accord U.S. v. Davis*, No. CRM 09-343, 2012 WL 895918, at
19   *1 (E.D. Pa. Mar. 16, 2012). The analysis and rationale as to why the government's burden of
20   proof is a preponderance of the evidence under § 3148 in *Gotti* is persuasive to this Court.

21   **A.    Step one**

22   The petition alleges that Mr. Damato failed to return to the half-way house on March 29,
23   2020. This Court finds by clear and convincing evidence that Mr. Damato violated that condition
24   of release. FBI Agent Jones testified that she learned from U.S. Pretrial Services officer Sandra
25   Bustos that Mr. Damato did not return to the half-way house prior to his hospitalization on March
26   30, 2020, at Southern Hills hospital (and she later clarified that Mr. Damato was not hospitalized
27   at the Southern Hills hospital but at a stand-alone ER affiliated with that hospital). Mr. Damato
28   was arrested on March 30, 2020, while attempting to pick up his dogs from an animal shelter.

**B.     Step two**

The court must revoke detention at this step in the analysis if the government establishes by a preponderance of the evidence that either (1) based on the factors in § 3142(g), there are no conditions that will assure defendant will not flee or pose a danger to any other person or the community, *or* (2) that defendant is unlikely to abide by any condition or combination of conditions. *Id.* § 3148(b)(2).

**1.     Risk of flight under § 3148(b)(2)(A)**

It is key to remember that the question here, at step two, differs from the question under step one. At step one, the question is whether the government proved by clear and convincing evidence that Mr. Damato violated conditions of his release. This Court found Mr. Damato violated one of the conditions of his release by failing to return to the half-way house on March 29, 2020. By contrast, the question under step two is whether the government can prove by a preponderance of the evidence, based on § 3142(g) factors, that there are no conditions that will "assure that the person will not flee." As it relates to this case, the specific question is whether the government met its burden of establishing that there are no conditions that will assure Mr. Damato will show up to his court appearances, based on Mr. Damato's failure to return to the half-way house on March 29, 2020, and the other evidence submitted at his revocation hearing. The Court is not persuaded that the government has carried this burden.

To make this determination, all the Court has before it is information about the events that occurred on the dates of March 27, 2020, to March 30, 2020.

There is information that on March 27, 2020, Mr. Damato went from the half-way house to the hospital and returned to the half-way house. On March 28, 2020, he remained at the half-way house.

Turning to March 29 and 30, 2020, there is evidence that Mr. Damato was hospitalized twice. Exhibits 1, 2 (under seal). While information derived from those hospitalizations is not entirely consistent, the following is consistent: Mr. Damato fell (possibly from a syncopal episode), and there was information to suggest he was dehydrated. The defense argued that the dehydration caused him to be confused. The Court acknowledges the number of times Mr.

Damato was hospitalized and the likely possibility that Mr. Damato may not have been as lucid or coherent as he may have otherwise been. However, the Court also cannot ignore the fact that Mr. Damato had the wherewithal to attempt to pick up his dogs from an animal shelter after being released from the hospital, despite whatever confusion he was allegedly suffering from. Thus, there is conflicting evidence about Mr. Damato's mental state when he was released from the hospital.

Ultimately, the reason this Court concludes that the government has not met its burden relates to the reservations that Mr. Damato made for the Embassy Suites for March 30 to April 6, 2020. First, the Court notes that the confirmation from the hotel was *sent* to Mr. Damato on March 29, 2020 at 2:09 p.m. Exhibit 3. This suggests that Mr. Damato made the reservation either while hospitalized on March 29, 2020 or prior to that while at the half-way house. And the Court finds that if Mr. Damato intended on absconding and relinquishing his obligation to show up to court as directed, he would have made the first day of the reservation March 29, 2020 or earlier—not March 30, 2020.

Importantly, March 30, 2020 was a Monday. This Court made clear that it would review any new proposals for moving out of the half-way house on an expedited basis and could have decided on March 30, 2020 whether it would allow Mr. Damato to reside at the Embassy Suites. Given the fact that Mr. Damato showed up to the half-way house on March 27, 2020, that he complied with his residence requirements on March 28, 2020, and that he did not make a reservation to start his stay at the Embassy Suites until March 30, 2020, this Court finds that the government has not proved by a preponderance of the evidence that (based on the factors set forth in § 3142(g)) no conditions can be fashioned to assure Mr. Damato will appear in court as instructed.

**2.      Dangerousness prong of § 3148(b)(2)(A)**

As to this portion of the analysis, it is important to compare the information the government presented during Mr. Damato's initial appearance on March 27, 2020—where the government argued conditions could be fashioned for his release—to the additional information presented at the hearing for revocation of pretrial release on April 23 and April 24, 2020.

As indicated above, during the initial appearance, the government did not move for detention. The government stated that while ordinarily it would seek detention in a case like this, due to the COVID-19 crisis and the underlying health conditions affecting Mr. Damato, it would not do so here. The government emphasized the seriousness of this case but also provided some context giving rise to the charges. Specifically, it appeared to the government that during the time in question, Mr. Damato was being evicted from his residence and grew increasingly upset with the property manager. His behavior during this period gave rise to state charges.

The state charges are based on allegations that Mr. Damato's behavior escalated from calling the property manager several times to eventually threatening to kill him. As a result of these interactions, the Las Vegas Metropolitan Police Department got involved and, it is alleged, Mr. Damato also threatened to kill one of the detective's family members.

The government also made note of the fact that Mr. Damato was HIV positive and suffered from other underlying conditions.[2] The government explained that they spoke to several stakeholders, including the Capitol Police in Washington D.C., which was acting as a conduit for Congresswoman Titus's office, and understood the government would not be seeking detention. The government mentioned that the Capitol Police understood the government's position and that "obviously in a perfect world they would want the defendant detained—that being said, based on the defendant's medical conditions as well as looking at the least restrictive conditions" they requested release with certain conditions. At bottom, after presenting this information the government determined that detention was not merited in this case.

The Court also heard arguments from the defense, who noted that there was no evidence that Mr. Damato possessed a gun or that he took any steps to act on his alleged threats. In short, the defense explained that Mr. Damato "went off the rails" as a result of, apparently, not taking his medications and the eviction proceedings. The defense also noted that two state court judges found it appropriate to release him on threat-related charges.

---

[2] During the hearing, the government provided the Court with records that corroborated the fact that Mr. Damato has several underlying conditions including HIV, mild intermittent asthma, and "epilepsy, unsp, not intractable, without status epilepticus."

This Court was persuaded by these arguments and released Mr. Damato. This Court made mention of the fact that Mr. Damato had no criminal history prior to the eviction procedure (other than a traffic-related citation) and agreed with the arguments made by the parties.

Since he was initially released, the only additional information that applies to this prong is that Mr. Damato made posts on Facebook calling Congresswoman Titus a tumbleweed and making other disparaging comments. Regardless of the appropriateness of those posts, none are threats. And no other evidence was submitted that Mr. Damato made any other threatening calls or that he otherwise took any steps to act on prior threats he allegedly made.

Given everyone's agreement on March 27, 2020, that conditions could be fashioned for Mr. Damato's release, the Facebook posts—which is the only new information—hardly tip the scales in the government's favor. Thus, the Court finds that the government has not shown by a preponderance of the evidence that, based on the § 3142(g) factors, there are no conditions of release that will assure Mr. Damato will not pose a danger to the community.

### 3. Unlikely to abide by any condition or combination of conditions of release.

The Court's analysis of this prong centers around much of what was previously discussed. The only evidence before this Court is behavior spanning from March 27–30, 2020. Mr. Damato complied with his conditions of pretrial release on March 27 and 28, 2020. By the time he was arrested on March 30, 2020, for failing to return to the half-way house on March 29, 2020, Mr. Damato had been hospitalized three times and it is not clear what physical and mental state he was in upon his release. Ultimately, as mentioned earlier, the reservation Mr. Damato made at the Embassy Suites was not to begin until March 30, 2020—although he could have made reservations to begin on March 27, 28, or 29. In short, while there is information that establishes that Mr. Damato failed to abide by his conditions of release during the period of time that included three different hospitalizations, there is insufficient information for this Court to determine that Mr. Damato, when stabilized, is unlikely to abide by any condition or combination of conditions of release in the future.

### C. Observations relating to Mr. Damato's incarceration

Having concluded the analysis involving 18 U.S.C. § 3148, this Court turns now to some concerning factors involving Mr. Damato's incarceration. When the government takes a person into its custody, it has a duty to assume some responsibility for his safety and general wellbeing. As mentioned previously, Mr. Damato is HIV positive. If he is infected with COVID-19, his health could be severely—if not irreversibly—compromised. Yet, as described below, the Nevada Southern Detention Facility unnecessarily exposed Mr. Damato to risks from which he may have not recovered.

As noted above, Mr. Damato was detained between March 26 and 27, 2020, and between March 31 and April 27, 2020. During the first period of incarceration, Mr. Damato self-reported his underlying conditions, including the fact that he was HIV positive. However, he was not provided any HIV medication during his two-day incarceration because he did not come into the facility with any medication, and the facility did not have time to obtain his medication before he was released the next day.

During the second period of incarceration, and even though the facility was aware that Mr. Damato was HIV positive based on his recent incarceration, HIV medications were not ordered until April 13, 2020 (when he saw a doctor for the first time). Given the 48-hour delay between the time a prescription is ordered and received, Mr. Damato did not take his HIV medication until April 15, 2020—15 days after he arrived at the facility. Medical staff at the facility explained that when an individual has not been on an HIV medication regimen, lab work is needed before an individual can safely re-start such a regimen. But despite knowing as of March 31, 2020 that Mr. Damato needed to restart an HIV medication regimen, labs were not ordered until April 8, 2020 (over a week after he entered the facility).

This is particularly concerning because the CDC has made clear that the risk of getting seriously ill as a result of COVID-19 is greatest for people who are HIV positive and unmedicated. CENTERS FOR DISEASE CONTROL AND PREVENTION, What to Know About HIV and COVID-19 (Mar. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/hiv.html. Despite this, Mr. Damato went without HIV medication for 15 days in the

type of place where the risk for infection and rapid spread is well documented. Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinic Infectious Diseases 1047, 1047 (Oct. 2007), http://doi.org/10.1086/521910 (noting that in jails "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding and delays in medical evaluation and treatment,"); Martin Kaste, *Prison and Jails Worry About Becoming Coronavirus 'Incubators'*, N.P.R. (Mar. 13, 2020), https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators.

    Moreover, the Court was provided with information that Mr. Damato was not housed in the "high-risk unit" until April 23, 2020—23 days after arriving to the facility. Mr. Damato was in the medical unit from March 31, 2020 until April 5, 2020. At that time, he "signed a waiver" opting out of the high-risk unit. Setting aside whatever rationale may have led to providing such a choice to someone with Mr. Damato's underlying conditions, information about the high-risk unit revealed concerning shortcomings as well. The wearing of masks at the time of this hearing was optional—even for the guards and other employees who had access to or worked in the high-risk unit. There was also testimony that unless there is physical contact with a detainee (e.g., a pat-down), guards typically do not wear gloves. This was also made apparent during the hearing, when Mr. Damato was seen without a mask and gloves interacting in very close proximity with guards—who also lacked gloves and masks—in the room where he was placed to have the video-conference court hearing.

    There was also evidence that the room where Mr. Damato was placed for the hearing was not disinfected between the time that a previous detainee used the room and the time that Mr. Damato was placed there. Moreover, nobody could determine when the last time the phone Mr. Damato had to use to communicate with his attorney during the hearing had been disinfected.

    Lastly, even though Mr. Damato was arrested off the streets on March 30, 2020, he was not isolated for a 14-day period to ensure he would not potentially transmit the coronavirus to others. The facility did not implement a practice of requiring a 14-day isolation period for new detainees until two weeks ago. Thus, Mr. Damato presumably shared his living space with other

individuals who had also been arrested off the streets and likewise had not been subject to this 14-day period of isolation.

All of these facts are extremely concerning to this Court. The Court is cognizant that everyone is adapting to the evolving nature of the COVID-19 crisis. However, we must vigilantly adhere to safety precautions. This is especially true for this case. Mr. Damato is HIV positive and at high risk for severe complications were he to contract COVID-19. Detention necessarily entails restrictions, discomforts, and a loss of privileges that freedom typically affords. Decidedly, one of the consequences of his incarceration is that Mr. Damato is dependent on those at the Nevada Southern Detention Facility for his health and wellbeing. A commitment to protecting those whose voices typically go unheard is fundamental to our justice system and to the respect and dignity of all persons.

### III.   Conclusion

IT IS THEREFORE ORDERED that Mr. Damato is released pending trial, subject to the following conditions:

1. The defendant shall report to U.S. Pretrial Services Office;
2. The defendant shall abide by all conditions of release of any current term of parole, probation, or supervised release;
3. The defendant shall abide by the following restrictions on personal association, place of abode, or travel: Travel is restricted to the following areas: Clark County, NV;
4. The defendant shall maintain residence at a halfway house or community corrections center as Pretrial Services or the supervising officer considers necessary;
5. The defendant shall pay all or part of the costs for residing at the halfway house or community corrections center based upon his/her ability to pay as Pretrial Services or the supervising officer determines;
6. The defendant shall avoid all contact directly or indirectly with any person who is or may become a victim or potential witness in the investigation or prosecution, (including but not limited to: Dina Titus and victims in the state court case);
7. The defendant shall refrain from possessing a firearm, destructive device, or other dangerous weapons;
8. The defendant shall refrain from use or unlawful possession of a narcotic drug or other controlled substances defined in 21 U.S.C. § 802 unless prescribed by a licensed medical practitioner. This includes Marijuana and/or any item containing THC;
9. The defendant shall submit to any testing required by Pretrial Services or the supervising officer to determine whether the defendant is using a prohibited

substance. Any testing may be used with random frequency and may include urine testing, a remote alcohol testing system and/or any form of prohibited substance screening or testing. The defendant shall refrain from obstructing or attempting to obstruct or tamper, in any fashion, with the efficiency and accuracy of any prohibited substance testing or monitoring which is/are required as a condition of release;

10. The defendant shall pay all or part of the cost of the testing program based upon his/her ability to pay as Pretrial Services or the supervising officer determines.
11. The defendant shall not be in the presence of anyone using or possessing: A narcotic drug or other controlled substances;
12. The defendant shall submit to a mental health evaluation as directed by Pretrial Services or the supervising officer;
13. The defendant shall participate in mental health treatment as directed by Pretrial Services or the supervising officer;
14. The defendant shall pay all or part of the cost of the medical or psychiatric treatment program or evaluation based upon his/her ability to pay as determined by Pretrial Services or the supervising officer;
15. The defendant shall submit to the type of location monitoring technology indicated below and abide by all of the program requirements and instructions provided by Pretrial Services or the supervising officer related to the proper operation of the technology.
    a. Location monitoring technology as directed by Pretrial Services or the supervising officer (smartlink);
16. The defendant shall not post on social media;
17. The defendant must take prescribed medication, including psychiatric medication, as directed;
18. The defendant must report via telephone any instance of COVID-19 symptoms, exposure, and/or quarantine immediately to the supervising officer;
19. The defendant must comply with the directives of medical, public health, and government officials with respect to quarantine and/or stay-at-home orders.

DATED: April 29, 2020.

_____
BRENDA WEKSLER
UNITED STATES MAGISTRATE JUDGE